THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : 3:21-CR-34 |
| | : (JUDGE MARIANI) |
| JAMES WILLIAMS, | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On May 2, 2018, a Criminal Complaint was filed against Defendant James Williams, III, in criminal case 3:18-cr-153. Attorney Carl J. Poveromo was appointed as counsel to represent Defendant. Six days later, a federal grand jury returned an eight-count indictment against the defendant. On August 29, 2018, Attorney Poveromo filed a motion to withdraw as counsel and the Court thereafter appointed Robert Levant, Esq., to represent Defendant in September, 2018.

On July 9, 2019, Defendant Williams signed a plea agreement and agreed to enter a guilty plea to two counts of the Indictment.[1] The Court scheduled a change of plea hearing for January 8, 2020. At the hearing, Defendant did not enter a guilty plea and requested a

---

[1] Although Defendant Williams signed the plea agreement on July 9, 2019, the Assistant U.S. Attorney did not sign the agreement until October 24, 2019, and it was filed of record on October 29, 2019. (See 3:18-cr-153, Doc. 42).

new attorney. As a result, on January 9, 2020, the Court appointed Williams' third defense counsel, Christopher Opiel, Esq.

On December 23, 2020, Defendant filed a Motion to Dismiss for Violation of the Speedy Trial Act and the United States Constitution. On January 27, 2021, this Court granted in part and denied in part Defendant's Motion, specifically, the Court granted the motion to dismiss the indictment due to a violation of the Speedy Trial Act, denied the motion to dismiss the indictment due to a violation of the Sixth Amendment, and dismissed the Indictment without prejudice. At the time the Indictment was dismissed, the plea agreement remained in place and Defendant had not filed a motion to withdraw the plea agreement pursuant to Fed. R. Crim. P. 11(d)(1) or filed any other document of record indicating an intent or desire to withdraw from the plea agreement.[2]

---

[2] Attorney Opiel implies that the Government should have known that Williams did not intend to plead guilty sometime after he declined to enter into a guilty plea on January 8, 2020. However, at the change of plea hearing, Defendant expressed concern that he was being rushed and the parties agreed to leave the plea agreement in place to allow Defendant time to discuss the plea agreement with new counsel. Subsequently, in April of 2020, Attorney Opiel filed a "Motion for Pretrial Release" (3:18-cr-153, Doc. 48) and supporting brief due to the COVID-19 pandemic, stating that "Mr. Williams does not have a scheduled Change of Plea Hearing" (3:18-cr-153, Doc. 49, at 3; Doc. 48, ¶ 13), indicating that Defendant was awaiting such a date as opposed to preparing for trial. In an email from Attorney Opiel to AUSA Camoni dated August 12, 2020, defense counsel asks whether the Government would consider a plea to Counts 4 and 6 of the Indictment, rather than Counts 1 and 6, but does not indicate any intent to withdraw the signed plea agreement should the Government decline. (*See* Hr'g Ex., Gov. D (Doc. 67-5, at 11)). Rather, the email notes that there is a typo in the signed agreement as to the Counts to which Defendant agreed to plead and states that he "just wanted to mention that so we don't possibly forget about it". (*Id.*). It is further of note that, following the denial of Defendant's COVID-19 motion by Magistrate Judge Mehalchick on May 1, 2020, no further filings appear of record until December, 2020, when Defendant moved to dismiss the indictment. (*See generally*, 3:18-cr-153).

As a result of the Court's dismissal without prejudice of the prior criminal case, the Government filed the above-captioned criminal action, through a Criminal Complaint, against Defendant James Williams on January 28, 2021. On February 23, 2021, the grand jury returned a six-count indictment charging Williams with two counts of distribution and possession with intent to distribute cocaine within 1,000 feet of a school in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 860 (Counts 1, 2); possession with intent to distribute 500 grams and more of a mixture containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B) (Count 3); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4); felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 5); and possession of a stolen firearm in violation of 18 U.S.C. § 922(j) and § 924(a)(2) (Count 6). (Doc. 24).

On June 19, 2021, Defendant filed a "Motion to Dismiss Indictment Due to Discovery Violation" (Doc. 43) requesting that the Indictment be dismissed with prejudice due to the Government allegedly not disclosing, until March of 2021, a Supplemental Narrative drafted in 2018 by FBI Task Officer Chris Shelly and Lab Reports of the two alleged controlled purchases in 2018.

The Court held an evidentiary hearing on Defendant's motion on January 5, 2023. At the hearing, the Government presented the testimony of Assistant U.S. Attorney ("AUSA") Sean Camoni and the Defendant presented the testimony of Defendant's prior counsel, Attorney Carl Poveromo. At the request of Defendant, and with the Government's

concurrence, the Court held the record open until January 9, 2023, at which time Defendant produced the testimony of Defendant's other prior counsel, Attorney Levant, and the Court heard oral argument from the parties.

Defendant's motion to dismiss is now ripe for resolution. For the reasons set forth herein, the Court will deny the "Motion to Dismiss Indictment Due to Discovery Violation" (Doc. 43).

## II. BACKGROUND

The parties' briefs, the testimony and oral argument at the evidentiary hearings, in conjunction with the exhibits admitted at the hearings, provide the basis for the relevant factual background of Defendant's motion.

At the January 5, 2023 evidentiary hearing, the Government admitted that there was no dispute that Defendant's counsel did not have the Lab Reports at issue until 2021 or physically possess the two incident reports of the controlled purchases. (Jan. 5, 2023 Hr'g Tr., at 6-7). At the hearing, the parties further stipulated that Attorney Poveromo was informed that there was additional discovery that he could view, but it was not physically provided to him. (*Id.* at 8-9) (*see also*, Hr'g Ex. Gov. A (Doc. 67-1, at 1) (May 21, 2018 email from AUSA Camoni to Attorney Poveromo stating that "I will get discovery materials to you by mail as soon as I have everything from the agents. Some amount of it will be best conveyed in an attorney proffer, because there are a number of confidential informants involved.")). The testimony and exhibits further demonstrated that Attorney Levant was also

provided the opportunity to review the additional discovery. (*See* Hr'g Ex. Gov. E (Doc. 67-5 at 1) (October 1, 2018 email from AUSA Camoni to Attorney Levant stating that "In addition to what I'll be sending [on the "discovery disc"] I have recordings and reports of a call and controlled buys that I normally don't produce unless there's a trial, but happy to discuss with you to make sure you're satisfied as to the basis for the search warrant. If we can resolve this case in a plea without having to identify sources, we can make sure the Judge knows that come sentencing.")). (*See also*, Jan. 5, 2023 Hr'g Tr., at 13, 25 (AUSA Camoni testifying that he offered both prior counsel the ability to view the documents, unredacted, and to discuss the documents with him).

AUSA Camoni testified at the hearing that he did not provide the supplemental reports describing the controlled purchases to either prior defense counsel because "[t]hose reports readily make apparent who the confidential informant was." (Jan. 5, 2023 Hr'g Tr., at 13). The Lab Reports may also have disclosed the identity of the confidential informant. (*Id*. at 15). Furthermore, according to AUSA Camoni:

> In addition, from the beginning of this case, I was told that this Defendant did not want to go to trial, that it was going to be a negotiated plea resolution, in which case, not identifying a confidential informant would actually benefit the Defendant, potentially, by telling the Judge that at sentencing. So it was a selling point for both parties.

(Jan. 5, 2023 Hr'g Tr., at 14). Additionally,

> . . . not only in the previous discovery would the controlled purchases have been identified to the Defense, but there was a reverse proffer, which is a meeting that we had between myself, agents from the FBI, Attorney Poveromo and Mr. Williams was present, where I [AUSA Camoni] told Mr. Williams we

> had controlled purchases through a confidential informant on two separate occasions from him, which led to the search warrant that he was already aware of.

(*Id.* at 18).

On October 2, 2020, Attorney Opiel sent AUSA Camoni an email stating a belief that he was "missing a discovery disk for Mr. Williams" and indicating that he had a disk "bate-stamped 0009-0110" and two disks "bate-stamped 0001-0111." (Hr'g Ex. Gov. E (Doc. 67-5, at 10)). Attorney Opiel further opined that he "believe[d he was] missing some documents related to a wiretap and/or warrant." (*Id.*). That same day, AUSA Camoni responded, asking his administrative assistant, Donna Borgia, to "reproduce all the discovery" and informing defense counsel that there was no wiretap in the case. (*Id.*). On October 5, 2020, Ms. Borgia emailed Attorney Opiel, notifying him that she had "looked over the Discovery and it looks like you are just missing documents Bates Stamped 0111-0130" and stating that she would mail the discovery disk that same day. (Hr'g Ex. Gov. F (Doc. 67-6, at 1)). At the evidentiary hearing, AUSA Camoni admitted that he could not remember whether he told Attorney Opiel, as he had previous counsel, "that he was free to come and view additional evidence." (Jan. 5, 2023 Hr'g Tr., at 16, 23).

When questioned as to why, after October of 2020 when the identity of the confidential informant had been revealed as the result of an unrelated federal trial, the Supplemental Report was still not turned over to the defendant or his counsel, AUSA Camoni explained that:

> There was still a signed plea agreement in that case, we hadn't been notified, yet, that Mr. Williams was actually rejecting the plea, so, at that point, there was no reason to turn over additional discovery, because there was a signed plea agreement.

(Jan. 5, 2023 Hr'g Tr., at 21; see also, id. at 37-38 ("So I [AUSA Camoni] may have overlooked the fact that I had some stuff we were withholding until trial, but at that point, I wasn't thinking this case was a trial, because both prior attorneys told me Mr. Williams does not want a trial, Mr. Poveromo was adamant about that in his emails, Mr. Levant pestered me for months until we came to an agreement that he actually signed before you [Attorney Opiel] represented him. We had a signed plea agreement, so I wasn't thinking about any new discovery or anything I would give you in preparation for trial, I thought you were asking me what was missing from what was previously produced, which is exactly what you asked me for, and that's what we gave you.")).[3]

Following the dismissal of criminal case 3:18-cr-153 and indictment of Williams in the above-captioned action on February 23, 2021, by email dated March 31, 2021, AUSA Roberts wrote to Attorney Opiel attaching the DEA lab report "relating to the drugs seized during the search of Williams' residence." (Hr'g Ex. Gov. G (Doc. 67-7, at 1)). The email further sought to confirm that Attorney Opiel already had a number of documents and photographs, including "Stroud Area Police reports of the two controlled purchases", the "search warrant, affidavit and inventory from the day of Williams' arrest", "Reports from the

---

[3] Once a plea agreement is signed, it is AUSA Camoni's practice not to disclose the identity of the confidential informant. (Jan. 5, 2023 Hr'g Tr., at 17).

day of the search warrant", "Lab reports from the two controlled purchases and the lab report regarding the drugs found at the time of the search." (*Id.* at 1-2). The email concluded by stating that "*Jencks* and *Giglio*, if any, will be provided immediately prior to trial." (*Id.* at 2).

## III. ANALYSIS

Williams now moves to dismiss the Indictment, with prejudice, due to an alleged *Brady* violation, which Defendant claims was the result of willful misconduct by the Government and caused him to suffer prejudice.

Here, Defendant asserts that:

> On March 12, 2021, [Defendant's] Counsel was made aware that a Supplemental Narrative drafted in 2018 by FBI Task Force Officer Christopher Shelly ("TFO Shelly") describing two (2) alleged controlled purchases from Mr. Williams as well as the Lab Reports from the two (2) alleged controlled purchases were never disclosed in discovery to Mr. Williams or his counsel. . . . The Government did send [Defendant's] Counsel the Supplemental Narrative and Lab Reports soon after the March 12, 2021 [pre-trial] meeting.

(Doc. 50, at 6). Upon review of the documents, Defendant argues that:

> The Supplemental Narrative and Lab Reports that were never disclosed to Defendant until after March 12, 2021, contain crucial material evidence that is directly related to the charges against Mr. Williams. The Supplemental Narrative contains information directly related to the alleged criminal activity of Defendant that is contrary to the information in all previously disclosed discovery.

(*Id.*). In particular, Defendant argues that because the "two separate descriptions [by Shelly] of the alleged first controlled purchase are materially contrary to each other," the "fact that the Government impermissibly withheld disclosure of the Supplemental Narrative

8

until almost three (3) years after Defendant was first charged severally [sic] prejudices the Defendant." (*Id.* at 8). Defendant asserts that he and his counsel were "mislead" for almost three years as to (1) "what alleged criminal conduct the Government intends to hold against the Defendant" and (2) "the authenticity of the information contained in the affidavit used to support the search warrant." (*Id.*). Defendant further contends that he and counsel "based their investigation and defense upon the description of the controlled purchase as described in the original discovery." (*Id.*).[4]

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Supreme Court extended the *Brady* rule when it decided *Giglio v. United States*, 405 U.S. 150 (1972), requiring the government to disclose evidence that goes to the credibility of prosecution witnesses. As explained by the Third Circuit, this evidence is referred to "as *Giglio* material, [and] is a subset of *Brady* material insofar as it addresses situations in which certain evidence about a witness's credibility or motivation to testify exists, and where 'the reliability of a given witness may well be determinative of guilt or innocence.'" *United States v. Maury*, 695 F.3d 227, 249 (3d Cir.

---

[4] Both at the evidentiary hearings and in his supporting brief, Defendant focused only on the alleged untimely disclosure of the Supplemental Reports. Although Defendant complains in his supporting brief that certain Lab Reports were not disclosed by the Government until March, 2021, he fails to set forth any argument as to how the alleged late disclosure of this material consists of a *Brady* violation or how he was prejudiced by its alleged untimely disclosure.

2012) (quoting *Giglio,* 405 U.S. at 154). *See also, Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) ("While the *Brady* decision itself concerned the failure of the prosecutor to disclose exculpatory evidence, it is clear that the rule announced in *Brady* applies with equal force to the prosecutor's failure to disclose evidence which could have been used for impeachment purposes.") (citing *United States v. Bagley,* 473 U.S. 667, 676 (1985); *Giglio,* 405 U.S. at 154).

The Supreme Court has outlined the "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). However, even if a Court determines that a *Brady* violation has occurred, dismissal may be appropriate only "where a defendant can show both willful misconduct by the government[] and prejudice." *Gov't of V.I. v. Fahie*, 419 F.3d 249, 255 (3d Cir. 2005).

In the present case, Defendant focuses on the differences between the Affidavit of Probable Cause and TFO Shelly's Supplemental Report in arguing the existence of a *Brady* violation.

In the "Master Affidavit of Probable Cause in support of a Criminal Complaint and Search Warrant", TFO Shelly states that during the first controlled purchase of cocaine from Williams on March 29, 2018:

10

> CW#1 met with Williams for a short duration under law enforcement surveillance. . . Williams agreed to meet CW#1 at a business in Stroudsburg, PA to sell cocaine to CW#1. Law enforcement established surveillance at the meet location where CW#1 and Williams agreed to meet. . . Williams . . . met with CW#1 for a short duration, and an exchange took place. Williams then returned to his vehicle and left the area. Williams was then followed by law enforcement back to 105 Thornley Road, East Stroudsburg, PA. Investigators met with CW#1 who provided the cocaine that he/she just purchased from Williams. Sergeant Lemond conducted a field test on this substance which yielded a positive response for the presence of cocaine.

(Hr'g Ex. Gov. H (Doc. 67-8, ¶ 17)). However, in the Supplemental Narrative, TFO Shelly states that during the first controlled purchase on March 29, 2018:

> Williams exited his vehicle and put cocaine in CHS1 parked vehicle. CHS1 never went to the vehicle. Sgt Lemond retrieved the cocaine and put the $500.00 in vehicle for payment. Williams returned to Pocono Plaza at 7:00pm and went into CHS1's vehicle and took the identifiable US currency. Sgt Lemond observed this action.

(Hr'g Ex. Gov. I (Doc. 67-9)).

Defendant argues that the Supplemental Narrative is *Brady* material because "[t]he two separate descriptions by TFO Shelly are clearly inconsistent statements made by the lead law enforcement agent on the case. The inconsistent statements are evidence that would be considered favorable to the Defendant because it directly attacks the credibility of the lead law enforcement agent on the case. Furthermore, the evidence is material to guilt or punishment because it directly relates [to] the alleged criminal conduct of selling a controlled substance." (Doc. 50, at 9). Defendant's counsel nonetheless admitted at the hearing that the Supplemental Narrative was not exculpatory, stating that he was not arguing that this evidence would tend to exonerate Williams. (Jan. 9, 2023 Hr'g Tr., at 10).

11

Upon review, the information itself that was incorrect in the first account of the March 29, 2018 transaction was not exculpatory. When the descriptions of the two events are compared, both clearly allege that (1) Defendant Williams and the CI met prior to the drug transaction to arrange the transaction, (2) a drug transaction occurred later that same day, (3) the transaction occurred on March 29, 2018, (4) the transaction occurred at a business in Stroudsburg, PA, (5) Defendant participated in the transaction, and (5) the same CI participated in the transaction. The only difference between the accounts is the description of the manner in which the transaction was carried out.

It is undisputed that the Affidavit of Probable Cause and TFO Shelly's Supplemental Narrative contain statements which are inconsistent. These provide Defendant with a proper basis for impeachment. However, the Supplemental Narrative consists of *Giglio* material where its purpose is to place at issue the credibility of the Government's witness and where the reliability of this witness may be determinative of guilt or innocence. *See Maury*, 695 F.3d at 249.

Although *Giglio* material is a subset *Brady* material, the time for disclosure differs. While *Brady* evidence must be turned over "in time for its effective use at trial," *Giglio* material need not be produced prior to trial. *United States v. Higgs,* 713 F.2d 39, 44 (3d Cir. 1983) (holding that a defendant's due process rights are satisfied as long as evidence pertaining to Government witness credibility is produced the day of their testimony). A panel of the Third Circuit addressed this issue in *United States v. Bashir,* 738 F.App'x 743

(3d Cir. 2018) (not precedential):

> Under *Brady*, a prosecutor is required to disclose evidence favorable to a defendant that is material to guilt or punishment. [*United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006)]. The obligation to disclose such "*Brady* material" is "not based on any general constitutional right to discovery in criminal cases, but rather on a defendant's due process right to a fair trial." *Higgs*, 713 F.2d at 42. "Because *Brady* rests on the requirements of due process, our focus [is] on when disclosure is necessary to insure [the defendant] a fair trial." *Id.* at 43. "To constitute a *Brady* violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant." [*United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984)]. "No denial of due process occurs if *Brady* material is disclosed to [the defendant] in time for its effective use at trial." *Higgs*, 713 F.2d at 44.
>
> Under *Giglio*, the prosecution must disclose "information that [the defendant] could use on cross-examination to challenge the credibility of government witnesses," and a defendant's "right to a fair trial will be fully protected if disclosure [of such material] is made the day that the witness testifies," because "[d]isclosure at that time will fully allow [the defendant] to effectively use that information to challenge the veracity of the government's witnesses." *Higgs*, 713 F.2d at 44. Thus, a defendant's "due process rights to a fair trial would be satisfied...as long as disclosure is made the day that the government witnesses are scheduled to testify in court." *Id.*

*Id.* at 748-49.

A determination of whether there has been a *Brady* violation, here allegedly through the late disclosure of *Giglio* material in the form of the Supplemental Narrative, and if so, whether the indictment should be dismissed, both depend upon a finding of prejudice to the defendant. The Court thus turns to this element.

Upon review of the record, Williams has failed to show he suffered prejudice as a result of any alleged delay in the disclosure of the Supplemental Narrative or Lab Reports.

13

Where the Supplemental Narrative is not exculpatory, its value to Defendant lies in his ability to use the inconsistent descriptions of the drug transaction at trial to impeach Government witnesses, and specifically TFO Shelly. Because at no time prior to Defendant's motion to dismiss in December of 2020 was there an indication from Defendant that he intended to proceed to trial, his ability now, where he has stated an intention to go to trial, to use the information under *Giglio* is not impaired. The Government's disclosure of the materials at issue in early-2021 provided Defendant with sufficient time to fully allow him to effectively use that information to challenge the veracity of the government's witnesses, including TFO Shelly. Additionally, as explained by the Government at the hearing, the Government would have disclosed the Supplemental Narrative in accordance with its established policy for *Giglio* impeachment information prior to trial, should the case have proceeded to trial.

Although Defendant also argues that the defense "based their investigation and defense upon the description of the controlled purchase as described in the original discovery" (Doc. 50, at 8),[5] the Court notes the incongruity of this statement. Defendant signed a plea agreement in July of 2019 in criminal case 3:18-cr-153. This plea agreement was never withdrawn and remained in place until the Court dismissed the criminal action in

---

[5] (*See also*, Jan. 9, 2023 Hr'g Tr., at 8 (defendant's counsel arguing prejudice because "Mr. Williams and his defense team were investigating and preparing a defense to this case, under the premise that the Government was pursuing charges, as stated in Paragraph 17 of the Affidavit of Probable Cause[, i]t's crucial and imperative to a Defendant and his defense attorney and any other investigators in the case to try to figure out who the confidential informant is, and we were using the allegations in Paragraph 17 of the Affidavit of Probable Cause to try to investigate the case.")).

January of 2021. Following the indictment of Williams on February 23, 2021, it is undisputed that counsel met to discuss the case and the Lab Reports and Supplemental Narrative were officially turned over in March of 2021. Thus, Defendant's argument that he suffered prejudice in building his defense and preparing for trial because he did not have certain information is unsupported where the record does not reflect that he had a stated intention of proceeding to trial until, at earliest, January of 2021 when a criminal complaint was filed against him.

For the foregoing reasons, and upon consideration of the testimony and exhibits presented at the evidentiary hearings and the parties' briefs, the Court concludes that Defendant's motion to dismiss must be denied.[6]

---

[6] Where the Court has found that Defendant did not suffer any prejudice as a result of the 2021 disclosure of the Supplemental Narrative and Lab Reports, it declines to address whether the evidence was "suppressed by the State, either willfully or inadvertently", *Strickler v. Greene*, 527 U.S. at 281-82. However, it is noteworthy that it is undisputed that both of Defendant's prior counsel were notified of the existence of the information at issue in Defendant's present motion, and that this information was made available to Attorneys Poveromo and Levant for review and inspection, neither of whom availed themselves of this offer. Defendant's evidence and arguments further fail to demonstrate any willful misconduct on the part of the Government which could support dismissal of the indictment. For example, the uncontradicted record evidence establishes that soon after the Government became aware of the discrepancy between the Affidavit and Supplemental Narrative, it notified Defendant. AUSA Camoni also testified that he did not become aware of the discrepancy regarding one of the controlled purchases set forth in the Affidavit for the search warrant and in the Supplemental Reports until "early in 2021". (Jan. 5, 2023 Hr'g Tr., at 18-19). Had he been aware of the discrepancy earlier, he admitted he would not have provided the reports at that time because it may have revealed the identity of the confidential informant but would have "pointed [it] out" to Defendant's counsel. (*Id.* at 19).

15

## IV. CONCLUSION

For the reasons set forth herein, Defendant Williams' Motion to Dismiss Indictment Due to Discovery Violation" (Doc. 43) will be denied. A separate Order follows.

_____
Robert D. Mariani
United States District Judge