THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:21-CR-34 |
| | : | (JUDGE MARIANI) |
| JAMES WILLIAMS, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant's Post-trial Motion for Judgment of Acquittal and New Trial (Doc. 199) is pending before the Court. In the six-count Indictment filed on February 3, 2021, Defendant was charged as follows: Count One and Count Two for knowing and intentional distribution and possession with intent to distribute cocaine within 1,000 feet of the real property of a public secondary school in violation of 21 U.S.C. §§ 841(a)(1) and 860; Count Three for knowing and intentional possession with intent to distribute 500 grams and more of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B); Count Four for knowing and intentional possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A); Count Five for knowingly possessing a firearm knowing he had been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and Count Six for knowing possession of a stolen firearm in violation of 18 U.S.C.

§§ 922(j) and 924(a)(2). (Doc. 24 at 1-4.) Defendant's four-day trial ended on April 20, 2023, with the jury returning a verdict of guilty on all counts. (Docs. 168, 172.)

Defendant filed his brief in support of the pending motion (Doc. 200) on October 16, 2023, asserting that he is entitled to judgment of acquittal on all counts, or, in the alternative he is entitled to a new trial because the evidence does not support the verdict (*id.* at 6-14).

After requesting and being granted an extension of time to file a response to Defendant's motion (Docs. 201, 202), the Government filed its opposition brief on November 15, 2023, (Doc. 205). Defendant filed a reply brief on December 14, 2023. (Doc. 208.) Therefore, this matter is fully briefed and ripe for disposition. For the reasons discussed below, the Court will deny Defendant's motion.

## II. BACKGROUND

The Government provides an appropriate summary of relevant evidence and testimony presented at trial testimony (Doc. 205 at 6-9) to which Defendant does not object (*see* Doc. 208). Therefore, the Court includes the Government's recitation here.

> The offenses for which Williams was convicted stemmed from a federal investigation into drug trafficking occurring at two commercial hotels in Monroe County, Pennsylvania. See Notes of Testimony ("N.T."), 4/18/23 at 44. During the investigation, federal authorities identified Williams as being involved in the trafficking scheme. *Id.* at 45. On two separate occasions, law enforcement utilized a confidential informant (CI) to conduct controlled purchases of cocaine from Williams.
>
> On March 29, 2018, CI purchased 9.86 grams of cocaine from Williams in exchange for $500.00 of prerecorded currency. To arrange the sale, CI contacted Williams via Facebook Messenger. *Id.* at 62-3. The sale took place in the parking lot of the Pocono Plaza Inn located in Stroudsburg, Pennsylvania

where CI worked as a bartender. *Id.* at 67. CI instructed Williams to put the cocaine inside her vehicle which was parked in the parking lot of the hotel. *Id.* at 71. While maintaining constant surveillance, law enforcement observed Williams arrive driving a white Nissan SUV that was rented to William's girlfriend, Niki Schroeder ("Schroeder"). *Id.* Upon arrival, Williams exited the vehicle and approached the driver's side of CI's car before returning to the Nissan and departing. *Id.* at 76-7.

Following Williams's departure, officers approached CI's car, retrieved the cocaine left by Williams from the center console of the vehicle and left $500.00 of prerecorded currency for Williams to pick up in exchange for the cocaine. *Id.* at 79. Shortly thereafter, Williams returned to the parking lot in the same vehicle and approached CI's vehicle to retrieve the $500 per CI's instructions. *Id.* at 88-90. The cocaine was retained by law enforcement in accordance with department regulations. *Id.* at 82, 98.

On April 18, 2018, CI, purchased 5 grams of cocaine from Williams in exchange for $250.00 of prerecorded currency. To arrange the sale, CI contacted Williams via a recorded Facebook phone call. *Id.* at 99. The sale took place in the Pocono Plaza Inn parking lot. *Id.* Williams arrived at the location in the same white Nissan SUV observed by law enforcement at the controlled purchase on March 29, 2018. *Id.* at 103, 106. Once Williams parked, CI entered Williams's vehicle and handed him the money in exchange for cocaine. *Id.* at 225-26. Law enforcement retained the cocaine in accordance with department regulations. *Id.* at 109-10.

On May 3, 2018, officers executed a search warrant at Williams's residence located at 105 Thornley Road, East Stroudsburg, Pennsylvania. N.T., 4/19/23 at 64. At the time of the search, Williams lived at the residence with Schroeder and their infant child. *Id.* at 65, 92. Officers recovered 649 grams of cocaine, a small digital scale with white residue, and a spoon with white residue from the kitchen counter. *Id.* at 75-78. Drug proceeds in excess of $17,000 in cash were found in a safe located in a closet in the dining room. *Id.* at 89-90, 99. From inside Schroeder's bedroom nightstand, a loaded .380 semi-automatic pistol registered to Schroeder was located. *Id.* at 86. In a nightstand identified as belonging to Williams, a loaded .357 Magnum revolver and a Walther P22 semi-automatic pistol with a scratched serial number were recovered. *Id.* at 80-4. The Walther P22 was confirmed stolen from Oklahoma. *Id.* at 94, 103-4. On top of the nightstand, law enforcement recovered over

$4,000 in cash. *Id.* at 80. Multiple cellular telephones and what witnesses described as "owe sheets" were also recovered during the search. *Id.* at 87-91.

(Doc. 205 at 6-9.)

### III. Standard of Review

#### A. <u>Motion for Judgment of Acquittal</u>

A defendant may move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Where "the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997).

> In ruling on a motion for judgment of acquittal made pursuant to Fed. R. Crim. P. 29, a district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilty [sic] beyond a reasonable doubt based on the available evidence.'" *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe,* 245 F.3d 257, 262 (3d Cir. 2001)). A finding of insufficiency should be "'confined to cases where the prosecution's failure is clear.'" *Smith,* 294 F.3d at 477 (quoting *United States v. Leon,* 739 F.2d 885, 891 (3d Cir. 1984)). Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury. *See United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir.) (en banc) (trial court usurped jury function by deciding contested issues of fact), *cert. denied,* 457 U.S. 1106, 102 S. Ct. 2906, 73 L.Ed.2d 1315 (1982); *see also* 2A Charles A. Wright, FED. PRAC. & PRO. (Criminal 3d) § 467 at 311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient ... It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury.").

*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). The Third Circuit has long advised

that, in considering a post-verdict judgment of acquittal, the court "must uphold the jury's

verdict unless no reasonable juror could accept the evidence as sufficient to support the

defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 914 F.3d 112, 183 (3d

Cir. 2019) (citing *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)). In *United*

*States v. Tyler*, the Third Circuit reiterated the well-recognized standard:

> This review is "highly deferential" to the factual findings of the jury, and we
> "must be ever vigilant ... not to usurp the role of the jury by weighing credibility
> and assigning weight to the evidence, or by substituting [our] judgment for
> that of the jury." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d
> Cir. 2013) (en banc) (alteration and omission in original) (quoting *United
> States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

> Thus, even if the evidence adduced is consistent with multiple
> possibilities, our role as a reviewing court is to uphold the jury verdict
> ... as long as it passes the bare rationality test. Reversing the jury's
> conclusion simply because another inference is possible – or even
> equally plausible – is inconsistent with the proper inquiry for review of
> sufficiency of the evidence challenges, which is that [t]he evidence
> does not need to be inconsistent with every conclusion save that of
> guilt if it does establish a case from which the jury can find the
> defendant guilty beyond a reasonable doubt. It is up to the jury – not
> the district court judge or our Court – to examine the evidence and
> draw inferences. Unless the jury's conclusion is irrational, it must be
> upheld.

> *Id.* at 433 (alteration in original) (internal quotation marks and citation omitted).

956 F.3d 116, 122-23 (3d Cir. 2020).

## B. Motion for a New Trial

A defendant may move for a new trial pursuant to Federal Rule of Criminal Procedure 33 which provides in pertinent part that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires . . . ." Fed. R. Crim. P. 33(a). The defendant "bears the burden of persuading the trial court that the interest of justice requires the grant of a new trial." *United States v. Ray*, Crim. No. 1:12-CR-58, 2016 WL 5787345, at *3 (M.D. Pa. Oct. 4, 2016) (quoting *United States v. Hammer*, 25 F. Supp. 2d 518, 534 (M.D. Pa. 1998)) (citing *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 719 (E.D. Pa. 2009)).

> "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial "only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (citation and quotation marks omitted). . . . Such motions are not favored and should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

*United States v. Silveus*, 542 F.3d 993, 1004-1005 (3d Cir. 2008). "The discretion that federal trial courts exercise in addressing allegations of juror and prosecutorial misconduct extends to the determination of whether prejudice has been demonstrated." *United States v. Smith*, 139 F. App'x 475, 477 (3d Cir. 2005) (citing *United States v. Resko,* 3 F.3d 684, 690 (3d Cir. 1993)). Where a defendant alleges that the cumulative effect of trial errors resulted

in an unfair trial, a new trial is required "only when 'the errors, when combined, so infected

the jury's deliberations that they had a substantial influence on the outcome of the trial.'"

*United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976

F.2d 132, 145 (3d Cir. 1992)).

## IV. ANALYSIS

In support of his Motion, Defendant first asserts that he is entitled to a judgment of

acquittal on Count Five of the Indictment (Doc. 24) which charged him with possession of a

firearm in violation of 18 U.S.C. § 922(g)(1) because this statutory provision is

unconstitutional both facially and as applied to him. (Doc. 200 at 6.) Defendant next asserts

that he is entitled to a judgment of acquittal or new trial on all counts because the evidence

does not support the verdict. (*Id.* at 11.) As to Counts One, Two, and Three, Defendant

contends that the evidence was insufficient for the jury to conclude that the alleged

substance was cocaine. (*Id.* at 13.) As to Counts One and Two, he contends that the

evidence was insufficient to conclude that the alleged transactions took place within 1,000

feet of a school. (*Id.*) Finally, as to Count Four, Defendant contends that no rational trier of

fact could have concluded that he possessed a firearm in furtherance of drug trafficking.

(*Id.*) Defendant makes no specific argument as to Count Six. In his reply brief, Defendant

addresses only his as-applied constitutional challenge to Count Five (Doc. 208 at 3) and the

effect of a successful as-applied challenge to his convictions on all other counts (*id.* at 5).

A. **Count Five**

As set out above, Defendant asserts that he is entitled to a judgment of acquittal on

Count Five of the Indictment which charged him with possession of a firearm in violation of

18 U.S.C. § 922(g)(1). (Doc. 200 at 6.)  Relying on the Supreme Court's decision in *New*

*York State Rifle Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and the Third Circuit's

decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), Defendant maintains that

§ 922(g)(1) is unconstitutional both facially and as applied to him. (*Id.*)  The Government

responds that *Range*, which is "the only circuit court decision to conclude that the

government did not carry its burden to demonstrate Section 922(g)(1)'s constitutionality as

applied to a person with a felony conviction, was wrongly decided and preserves all

arguments in support of that position." (Doc. 208 at 12 (listing cases).)  The Government

further responds that *Range* is distinguishable from this case. (*Id.*)  For the reasons that

follow, the Court finds that § 922(g)(1) is not facially unconstitutional or as-applied to

Defendant.

1. **The *Bruen* and *Range* Decisions**

The Second Amendment of the United States Constitution provides that "[a] well

regulated Militia, being necessary to the security of a free State, the right of the people to

keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *Bruen*, the Supreme

Court, consistent with its precedent, re-affirmed that "the Second and Fourteenth

Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*,

8

597 U.S. at 19 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)); *see also id.* at 8-9 ("In [*Heller* and *McDonald*] we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.").

Although the Second Amendment confers an individual right to keep and bear arms, this right is "not unlimited." *Heller,* 554 U.S. at 595, 626.  As the Supreme Court in *Heller* explained:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627 (internal citations omitted); *see also McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or

laws imposing conditions and qualifications on the commercial sale of arms. We repeat

those assurances here.") (internal citation omitted).[1]

In examining its precedent, the Supreme Court in *Bruen* set forth the appropriate test

a Court must apply in determining whether a firearm regulation violates the Second

Amendment:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text
> covers an individual's conduct, the Constitution presumptively protects that
> conduct. To justify its regulation, the government may not simply posit that the
> regulation promotes an important interest. Rather, the government must
> demonstrate that the regulation is consistent with this Nation's historical
> tradition of firearm regulation. Only if a firearm regulation is consistent with this
> Nation's historical tradition may a court conclude that the individual's conduct
> falls outside the Second Amendment's unqualified command.

*Bruen*, 597 U.S. at 17 (internal quotation marks omitted); *see id.* at 19 ("the government

must affirmatively prove that its firearms regulation is part of the historical tradition that

delimits the outer bounds of the right to keep and bear arms."). A Court must therefore first

address the threshold question of whether the Second Amendment's plain text covers the

individual's conduct at issue and, if it determines the conduct is covered, engage in an

analysis of whether the Government has affirmatively demonstrated that the regulation at

issue is consistent with this Nation's historical tradition of firearm regulation.

---

[1] When setting forth the above-quoted "longtime prohibitions" and explicitly warning that nothing in its opinion "should be taken to cast doubt" on these longstanding prohibitions, the *Heller* Court titled these prohibitions as "*presumptively* lawful regulatory measures." *Heller*, 554 U.S. at 627 n.26 (emphasis added). Nonetheless, two years later in *McDonald*, the Supreme Court confirmed the continued validity of its statement in *Heller* as to the legality of the longtime prohibitions, without the re-iteration or inclusion of any qualifying language.

In *Range v. Attorney General*, Bryan Range sought a declaration that § 922(g)(1) violated the Second Amendment as applied to him and requested an injunction prohibiting the law's enforcement against him. Applying the principles of *Bruen*, the Third Circuit first answered in the affirmative the "threshold question" of whether Range is one of "the people" protected by the Second Amendment, reasoning that "the people" "refers to all members of the political community" and Second Amendment rights "presumptively 'belong[] to all Americans.'" *Range*, 69 F.4th at 101 (quoting *Heller*, 554 U.S. at 580, 581). The Circuit Court then turned to the first step of the *Bruen* analysis – whether the Second Amendment's plain text covers the individual's conduct at issue – finding that § 922(g)(1) does regulate Range's request to possess a rifle to hunt and a shotgun to defend himself at home and therefore the Second Amendment presumptively protects Range's conduct. *Id.* at 103.

Having determined that Range's conduct was protected by the Second Amendment, the Circuit Court engaged in the second step dictated by *Bruen*: an analysis of whether the Government had affirmatively demonstrated that it was justified in "applying § 922(g)(1) to Range 'by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Range*, 69 F.4th at 103. The Third Circuit rejected each of the Government's arguments, ultimately finding that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Id.* at 106.

**2. Defendant's Facial Challenge to § 922(g)(1)**

Here, in light of the Supreme Court's decision in *Bruen* and the Third Circuit's recent application of *Bruen* in its decision in *Range*, Defendant asserts that § 922(g)(1) is facially unconstitutional. However, *Bruen* did not invalidate, alter, or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations. In *Bruen*, the Court rejected the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" that had been applied by the lower courts after *Heller* and *McDonald*, holding that the second-step – application of a "means-end" analysis – "is one step too many." *Bruen*, 597 U.S. at 18-19. In so doing, the Court emphasized that

> [s]tep one of the predominant framework [determining whether regulated conduct falls beyond the Second Amendment's original scope] is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.

*Bruen*, 597 U.S. at 19. The Supreme Court in *Bruen* took great effort to avoid undermining its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of those decisions. *See, e.g., Bruen*, 597 U.S. at 26 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id*. at 27 ("*Heller* itself exemplifies" the straight-forward inquiry into the Second Amendment's text

and historical understanding); *id*. at 29 ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

Thus, the Court here does not engage in an uninformed analysis in determining whether the Second Amendment's plain text covers the possession of a firearm by a felon, and if so, whether the Government has affirmatively demonstrated that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation, where the Supreme Court in *Bruen* has already signaled the answer to this question.

The Court in *Heller* made clear that the rights secured by the Second Amendment are not unlimited, enumerating a number of examples including the "longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626-627. Despite Defendant's suggestion to the contrary, *Bruen* did not undermine the Court's statement in *Heller*. *Bruen*, quoting *Heller*, re-iterated that "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance – struck by the traditions of the American people – that demands our unqualified deference." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). The *Bruen* decision further stated that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one

could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 38. This observation in *Bruen* is entirely consistent with *Heller*'s recognition of the legality of the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626-627.

The conclusion that *Bruen* does not disturb the prior analyses of *Heller* and *McDonald* is further supported by the concurrences and the dissent in *Bruen*. Justice Alito, in his concurrence, specifically noted the following:

> Our holding [in *Bruen*] decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. <u>Nor have we disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns.</u>

*Bruen*, 597 U.S. at 72 (Alito, J., concurring) (underline added). Justice Kavanaugh, with whom Chief Justice Roberts joined, wrote separately "to underscore two important points about the limits of the Court's decision" in *Bruen.* The second point reads as follows:

> *Second*, as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." . . . Properly interpreted, the Second Amendment allows a "variety" of gun regulations. *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. As Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice ALITO reiterated in relevant part in the principal opinion in *McDonald*:
>
> > "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.... [N]othing in our opinion

should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.] . . .

*Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring). Justice Breyer, in his dissenting opinion, agreed with Justice Kavanaugh, stating that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" addressing presumptively lawful firearm restrictions, including the prohibition of the possession of a firearm by a felon, *id.* at 129 (Breyer, J., dissenting).[2]

---

[2] This Court also notes Justice Alito's dissent in *New York State Rifle & Pistol Association, Inc. v. City of New York*, 140 S. Ct. 1525 (2020), issued two years prior to *Bruen*. In that case, the Supreme Court vacated the judgment of the Second Circuit Court of Appeals and remanded the case for further proceedings where it deemed Petitioners' claim for injunctive relief against New York City moot because the city had altered its firearm licensing statute following the Supreme Court's grant of certiorari. In dissent, Justice Alito opined that the case was not moot and proceeded to an analysis of the merits of plaintiffs' claim that the city firearm ordinance violated the Second Amendment. Justice Alito began his analysis as follows:

> In *Heller*, we held that a District of Columbia rule that effectively prevented a law-abiding citizen from keeping a handgun in the home for purposes of self-defense constituted a core violation of the Second Amendment. 554 U.S. at 635, 128 S.Ct. 2783. We based this decision on the scope of the right to keep and bear arms as it was understood at the time of the adoption of the Second Amendment. *Id.*, at 577-605, 628-629, 128 S.Ct. 2783. We recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals. *See id.*, at 626-627, 128 S.Ct. 2783; *see also McDonald*, 561 U.S. at 787, 904, 130 S.Ct. 3020. But history provided no support for laws like the District's. *See* 554 U.S. at 629-634, 128 S.Ct. 2783.

*Id.* at 1540-1541 (Alito, J., dissenting). Justice Alito's dissent concluded by foreshadowing the Supreme Court's eventual holding in *Bruen* in 2022 rejecting the application of "means-end" scrutiny. *Id.* at 1544 ("We are told that the mode of review in this case is representative of the way *Heller* has been treated in the lower courts. If that is true, there is cause for concern."). Although Justice Kavanaugh concurred with the majority in that case, he wrote separately, stating that while he agreed that the claim for injunctive relief

The concurrences and dissent in *Bruen* underscore that the Supreme Court foresaw the legal challenges which may arise as a result of its decision, including the issue now raised in the present motion to dismiss by the defendant. That Justices Kavanaugh, Roberts, and Alito each determined the need to highlight the particular language in *Heller* setting forth certain presumptively lawful "longstanding prohibitions" demonstrates a desire to make clear the limits of the Supreme Court's decision in *Bruen* and to emphasize the remaining viability of the Supreme Court's statements in *Heller* and its progeny as to specific conduct which falls outside of the protection of the Second Amendment and which may be properly curbed by gun regulations.

This Court acknowledges the *Range* majority's rejection of the Government's reliance on the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and the Justices' concurring and dissenting opinions in *Bruen* underscoring this statement. *Range*, 69 F.4th at 103-104. The Third Circuit reasoned that

> [e]ven if the 1938 Act [Federal Firearms Act of 1938] were "longstanding" enough to warrant *Heller*'s assurance – a dubious proposition given the *Bruen* Court's emphasis on Founding-and Reconstruction-era sources, 142 S. Ct. at 2136, 2150 – Range would not have been a prohibited person under that law. Whatever timeframe the Supreme Court might establish in a future case, we

---

was moot, he "agree[d] with Justice Alito's general analysis of *Heller* and *McDonald*" and "share[d] Justice Alito's concern that some federal and state courts may not be properly applying *Heller* and *McDonald*." *Id.* at 1527 (Kavanaugh, J., concurring). Justices Alito and Kavanaugh's statements in this 2020 precursor to *Bruen* further support a finding that the Supreme Court did not intend anything in *Bruen* to be interpreted as overturning or modifying its decision in *Heller*, including *Heller*'s "recogni[tion] that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons and other dangerous individuals", *id.* at 1540-1541 (Alito, J., dissenting).

are confident that a law passed in 1961 – some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification – falls well short of "longstanding" for purposes of demarcating the scope of a constitutional right. So the 1961 iteration of § 922(g)(1) does not satisfy the Government's burden.

*Id*. at 104.

The Third Circuit's reasoning, in light of the test set forth by *Bruen*, seemingly leads to the conclusion that the "presumptively lawful regulatory measures" identified in *Heller*, most of which arguably have clearer origins in the 20th century, do not comport with the Supreme Court's test requiring that a firearm regulation must be consistent with this Nation's historical tradition of firearm regulation in order to not violate the Second Amendment. Nonetheless, six Justices clearly warned that the *Bruen* decision *should not* be read as casting doubt on the validity of certain firearms regulations, including those identified in *Heller*. Specifically, Justices Alito, Kavanaugh, and Roberts, in concurring, all made explicit reference to *Heller*'s enumerated lawful firearm restrictions and emphasized that the decision in *Bruen* did not disturb this statement in *Heller*. Additionally, the dissent, Justices Breyer, Sotomayor, and Kagen, also noted agreement that the majority in *Bruen* did not "cast . . . doubt" on *Heller*'s identification of "presumptively lawful firearm" restrictions. Thus, this Court is unable to agree with Defendant that the decisions in *Bruen* and *Range* require a finding that § 922(g)(1) is facially unconstitutional.  *See Range*, 69 F.4th at 111 (Ambro, J., concurring) ("Given that three Justices in *Bruen*'s majority opinion reminded us that felon-in-possession laws remain presumptively lawful, and the three

dissenting Justices echoed that view, . . . a sound basis exists for § 922(g)(1)'s

constitutional application in a substantial amount of cases. Any historical inquiry that

reaches a contrary result must be wrong in view of the answer the Supreme Court has

already supplied. *See* [*United States v.*] *Jackson*, 69 F.4th [495, 501-02 (8th Cir. 2023)].");

*id*. at 113 (Shwartz, J., dissenting) ("[T]he Supreme Court has made clear that [§ 922(g)(1)]

bans are presumptively lawful . . .").[3]

     *Bruen* did not overturn, abrogate, or otherwise suggest that the longstanding

prohibitions identified in *Heller*, including the prohibition of possession of firearms by felons,

were no longer lawful. In addition, the majority and concurring opinions in *Range* made clear

that their decision was narrowly tailored to as-applied challenges of § 922(g)(1). The Circuit

Court did not hold that § 922(g)(1) is unconstitutional on its face and instead was careful to

instruct that the statute remained facially constitutional at this time. *See Range*, 69 F.4th at

106 ("Our decision today is a narrow one. Bryan Range challenged the constitutionality of

18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. §

481(a).") (Hardiman, J., majority); *id*. at 109 (Government's failure to carry its burden in this

case "does not spell doom for § 922(g)(1)" and the statute remains "'presumptively lawful'")

---

[3] Furthermore, while casting doubt on a court's ability to consider the Federal Firearms Act of 1938, a precursor to the present statutes regulating the possession of firearms which include § 922(g), *Range*'s reasoning did not explicitly preclude consideration of that 1938 Act, instead calling its consideration "dubious." The Court instead only found that the law passed in 1961 fell short of "longstanding." The Circuit Court, in passing, did consider the application of the 1938 firearms law to Range, finding that "Range would not have been a prohibited person under that law" where that law only applied to violent criminals. *Range*, 69 F.4th at 104.

(Ambro, J., concurring). [4]  Thus, this Court remains bound by the Supreme Court's decision in *Heller* and its progeny and Defendant's motion based on the facial constitutionality of § 922(g)(1) will be denied.

### 3. Defendant's As-Applied Challenge to § 922(g)(1)

In addition to asserting that § 922(g)(1) is facially unconstitutional, Defendant also argues that § 922(g)(1) is unconstitutional as applied to him. (Doc. 200 at 6.) The prior criminal conviction upon which Count Five is based is Defendant's October 1, 2015, conviction in the Monroe County Court of Common Pleas for Manufacture, Delivery, or Possession with Intent to Manufacture or Deliver a Controlled Substance, an ungraded felony, in violation of 35 P.S. § 780-113(a)(30). (N.T. Apr. 20, 2023, 100:15-102:21 (citing Gov't's Exs. 125, 131).)

Whereas "[t]o prevail on a facial challenge [to a statute], a plaintiff must 'establish that no set of circumstances exists under which the [law] would be valid,'" the standard for bringing an as-applied challenge "is less demanding; a plaintiff need only show that a law's 'application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 134 & n.7 (3d Cir.

---

[4] Although in a different factual and legal context, this Court notes that post-*Bruen*, the Third Circuit has re-affirmed in a precedential opinion that "the government may confiscate guns from those who have been convicted of serious crimes or committed dangerous acts." *Frein v. Penn. State Police*, 47 F.4th 247, 256 (3d Cir. 2022) (citing *Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016)).

2022) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) then *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)).

Where the Third Circuit in *Range* found that the Government had failed to show that "our Republic has a longstanding history and tradition of depriving people like Range of their firearms," 69 F.4th at 106, this Court must begin with the undeniable observation that Defendant Williams is in no way "like Range." In determining whether § 922(g)(1) was unconstitutional as applied to Range, the Third Circuit took into consideration the underlying conviction itself (making a false statement to obtain food stamps), the purported reason for Range's actions leading to his conviction (he and his wife struggled to raise "three young children on $300 per week"), the age of the conviction (28 years old), Range's subsequent law-abiding lifestyle, and the reason Range now wanted the firearm (deer hunting and self-defense). *Range*, 69 F.4th at 98-99. Unlike Range who pleaded guilty to a state law misdemeanor[5] over 25 years ago and who has not since engaged in criminal activity,

---

[5] The Circuit Court explained the reason that Range's misdemeanor conviction precluded him from possessing a firearm:

> When Range pleaded guilty in 1995, his conviction was classified as a Pennsylvania misdemeanor punishable by up to five years' imprisonment. That conviction precludes Range from possessing a firearm because federal law generally makes it "unlawful for any person ... who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Although state misdemeanors are excluded from that prohibition if they are "punishable by a term of imprisonment of two years or less," 18 U.S.C. § 921(a)(20)(B), that safe harbor provided no refuge for Range because he faced up to five years' imprisonment.

William's prior felony conviction is for a drug trafficking offense. Unlike Range who sold his deer-hunting rifle upon discovering that he was legally barred from having a firearm due to his 1995 conviction, *Range*, 69 F.4th at 98-99, Williams was convicted in the present case of possessing a stolen firearm, a conviction which means the jury had to find that Defendant knew or had reason to believe the gun was stolen. (*See* N.T. Apr. 20, 2023, 72:7-9.) While there is no indication that Range ever used his rifle or any other firearm to engage in any illegal activity, Williams was convicted in the present case of possessing a firearm in furtherance of a drug trafficking crime. Thus, no factual parallels can be drawn between Range and Defendant Williams such that this Court can find that Williams is "like Range" in any manner aside from the fact that they were both statutorily barred from possessing a firearm due to a prior qualifying criminal conviction.

Nonetheless, the Court turns to Defendant's as-applied challenge, applying the legal principles of *Bruen* and *Range*. Here, in light of *Range*, it is evident that Defendant is considered one of "the people" protected by the Second Amendment. This Court further assumes for purposes of this analysis that the Second Amendment's plain text covers Defendant's conduct, *i.e.* his possession of a firearm.[6] The Court thus examines the central

_____

*Range*, 69 F.4th at 98.

[6] The Government argues that the Second Amendment does not apply because there is insufficient evidence that he possessed the firearms for a lawful purpose. (Doc. 205 at 18.)  The Court rejects this argument, which presents an attempt to write a new requirement into the tests set forth in *Bruen* and *Range*. *Cf. United States v. Harper*, Crim. No. 3:22-CR-397, 2023 WL 5672311, at *9 (M.D. Pa. Sept. 26, 2023) ("even if [Defendant] asserted that he possessed the firearm for the purpose of self-defense, he would still stand accused of violating Section 922(g)(1) because the possession of a firearm for any

issue: whether the application of § 922(g)(1) to Defendant Williams is consistent with this Nation's historical tradition of firearm regulation.

The *Bruen* Court provided guidance to aid courts in determining whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation, explaining that "[i]n some cases," the inquiry that courts must undertake to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding "will be fairly straightforward", *Bruen*, 597 U.S. at 26.

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id*. at 26-27.

The Court in *Bruen* recognized that some "historical analogies [as in *Bruen* and *Heller*] are relatively simple to draw, [but] other cases implicating unprecedented societal

---

purpose is a criminal act based on his status as a convicted felon."); *United States v. Quailes*, Crim. No. 1:21-CR-0176, 2023 WL 5401733, at *8 (M.D. Pa. Aug. 22, 2023) ("In a criminal case, a defendant accused of illegal possession of a firearm pursuant to Section 922(g) cannot be required to state his purpose for possessing a firearm without simultaneously admitting the possession, which is an element of the offense. The crux of the Section 922(g)(1) charge is that the mere possession of a firearm is a criminal act due to the defendant's status as a convicted felon.").

concerns or dramatic technological changes may require a more nuanced approach." *Id*. at

27. The Court then drew further comparisons and provided guidance for courts conducting

the relevant inquiry:

> The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution – and a Second Amendment – "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 What. 316, 415 4 L. Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. *See, e.g., United States v. Jones*, 565 U.S. 400, 404-05, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (holding that installation of a tracking device was "a physical instrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted").

>           . . . .

> Much like when confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy – a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And because "[e]verything is similar in infinite ways to everything else," *id.,* at 744, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Expertise and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). . . .

> While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think reasoned that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right."

*McDonald*, 561 U.S. at 767, 130 S. Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S. Ct. 2783); *see also id.,* at 628, 128 S. Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry. *McDonald*, 561 U.S. at 767, 130 S. Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S. Ct. at 2783).

. . . [A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.

*Bruen*, 597 U.S. at 27-30.

In the present case, the Government argues that "[t]here is clear historical support for restricting the possession of firearms by persons who, like Williams, previously committed dangerous felonies." (Doc. 205 at 23.) In support of this assertion, the Government presents a series of 17th, 18th, and 19th century purported historical analogues wherein statutes disarmed individuals who were deemed dangerous, untrustworthy, or unlikely to abide by the law. (*See id.* at 24-28.)

In the as-applied challenge, this Court must determine whether the "how and why" of a traditional historical regulation limiting a particular person's ability to possess a firearm is sufficiently analogous to "how and why" § 922(g)(1) burdens Defendant's right to armed self-defense, *i.e.*, whether § 922(g)(1) and the historical regulations set forth by the Government impose a comparable burden on Defendant's right of armed self-defense and whether that burden is comparably justified. *See Bruen,* 597 U.S. at 29.

In *Range*, the Circuit Court rejected the Government's argument that "'legislatures traditionally used status-based restrictions' to disarm certain groups of people" as support for finding a historical analogue to the situation faced by Range, reasoning that:

> Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances. That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be "far too broad[ ]." *See Bruen*, 142 S. Ct. at 2134 (noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there).

*Range*, 69 F.4th at 104-105.

Although the Third Circuit Court found that Range "and his individual circumstances" were not sufficiently analogous to "groups [the founding-era governments] distrusted," the same cannot be said of Williams. As previously set forth, *see supra* pp. 20-21, Williams is not "like Range." Historically, there is little evidence that the crime for which Range was convicted had any clear founding-era analogue, and even if it did, that it was a crime a consequence of which a person could be barred from the possession of a firearm. Conversely, the same concerns underlying the disarmament of "distrusted" groups such as "Loyalists, Native Americans, Quakers, Catholics, and Blacks" support the prohibition of firearms by felons convicted of a drug trafficking offense. *Cf. Range*, 69 F.4th at 112 ("Range committed a small-time offense. He did so with a pen to receive food stamps for his family. There is nothing that suggests he is a threat to society. He therefore stands apart

from most other individuals subject to § 922(g)(1) whom we fear much like early Americans feared loyalists. . .") (Ambro, J., concurring).

In her dissent in *Range*, Judge Krause set forth an extensive survey of 17th, 18th, and 19th century law relating to the prohibition of firearms by certain individuals.[7] Judge Krause first noted that "[d]uring the late seventeenth century, the English government repeatedly disarmed individuals whose conduct indicated that they could not be trusted to abide by the sovereign and its dictates", *Range*, 69 F.4th at 120 (Krause, J., dissenting). Thereafter,

> [t]he English notion that the government could disarm those not considered law-abiding traveled to the American colonies. Although some of the earliest firearm laws in colonial America forbid Native Americans and Black persons from owning guns, the colonies also repeatedly disarmed full-fledged members of the political community as it then existed – i.e., free, Christian, white men – whom the authorities believed could not be trusted to obey the law.

*Id.* at 122. As colonies became independent during the Revolutionary War, state legislatures "continued to disarm individuals whose status indicated that they could not be trusted to obey the law." *Id.* at 124. Certain "state legislatures conditioned their citizens' ability to keep arms on compliance with that civic obligation [to comply with communal judgments regarding proper behavior], and several states enacted statutes disarming all those who refused to recognize the sovereignty of the new nation." *Id.*

_____

[7] The Court recognizes that Judge Krause dissented in *Range*, but cites to her thorough historical review to demonstrate why historical analogues which the majority found to be inapplicable to Range are nonetheless sufficiently relevantly similar historical analogues to § 922(g)(1) as applied to Williams.

Judge Krause's historical survey is also largely paralleled in Judge Ambro's

concurring opinion in *Range*:

> We begin with a look to firearm regulation in the era of the Second
> Amendment's ratification. In England, non-Anglican Protestants and Catholics
> were disarmed during times of tumult. *See Range v. Att'y Gen.*, 53 F.4th 262,
> 274-76 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992
> (3d Cir. 2023). The American colonies also disarmed religious dissenters. *See
> id*. at 276-77. And in the Revolutionary War period, British loyalists and those
> who refused to take loyalty oaths were disarmed by several colonies. *See id*.
> at 277-79. *See also* [*United States v.*] *Jackson*, 69 F.4th [495, 502-03 (8th Cir.
> 2023)].
>
> True, those laws are, by today's standards, unconstitutional on non-
> Second Amendment grounds. But at our Founding they were measures driven
> by the fear of those who, the political majority believed, would threaten the
> orderly functioning of society if they were armed. From this perspective, it
> makes sense that § 922(g)(1) is presumptively lawful. Society is protecting itself
> by disarming, *inter alia*, those who murder, rob, possess child porn, and leak
> classified national security information. *See id*. at 504-06. Most felons have
> broken laws deemed to underpin society's orderly functioning, be their crimes
> violent or not. Section 922(g)(1) thus disarms them for the same reason we
> prohibited British loyalists from being armed.

*Range*, 69 F.4th at 111-112 (Ambro, J., concurring); *id*. at 110 (Judge Ambro stating §

922(g)(1) remains presumptively lawful "because it fits within our Nation's history and

tradition of disarming those persons who legislatures believed would, if armed, pose a threat

to the orderly functioning of society" and explaining that the fact that "Range does not

conceivably pose such a threat says nothing about those who do."); *see also id.* at 115

(Shwartz, J., dissenting) ("The felon designation . . . serves as a proxy for disloyalty and

disrespect for the sovereign and its laws."); *see also United States v. Folajtar v. Att'y Gen.*,

980 F.3d 897, 908 (3d Cir. 2020), *abrogated by Range v. Att'y Gen.*, 69 F.4th 96 (2023),

("[w]hat concerned the Framers was that 'virtuous citizens' retain the right to bear arms. . . ; they had no interest in extending the same guarantee to those who act counter to society's welfare, whether by violent or non-violent acts.") (internal citation omitted); *United States v. Reichenbach*, Crim. No. 4:22-CR-00057, 2023 WL 5916467, at *6-7 (M.D. Pa. Sept. 11, 2023) (Brann, J.) (setting forth 18th and 19th century laws targeting "groups that lawmakers deemed dangerous and disruptive to society, and [which] were aimed at protecting the public from violence and disorder."); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) ("founding era-legislatures categorically disarmed groups whom they judged to be a threat to the public safety.") (Barrett, J., dissenting).[8]

This Court agrees with the Government's position that a number of historical statutes disarming individuals who were deemed dangerous, untrustworthy, or unlikely to abide by the law are proper historical analogues to § 922(g)(1), and specifically to § 922(g)(1)'s application to Williams. (*See* Doc. 205 at 24-32.) The analogue rests in the identification by the Government of persons who could be lawfully disarmed, specifically those who were deemed a threat to "the orderly functioning of society," *Range*, 69 F.4th at 110, irrespective of the differences between those who were perceived to fit within that status at the time of the Founding and the ratification of the 14th Amendment and Williams at present.[9]

---

[8] The Third Circuit in *Range* expressly declined to determine whether "dangerousness" is the touchstone in determining whether there is a sufficiently analogous statute or regulation permitting the disarmament of certain groups of people. *Range*, 69 F.4th at 104 n.9.

[9] To find otherwise would almost certainly render § 922(g)(1) inapplicable as applied to any offender. To the extent that a reading of *Bruen* or *Range* would be said to require that the perceived evil or

In *Reichenbach*, Judge Brann provided an extensive analysis of "whether § 922(g)(1) may properly bar drug traffickers from possessing firearms," 2023 WL 5916467, at *6, and concluded that, "[u]sing [reviewed] early American laws as rough historical analogues, the question of 'how and why the regulations burden a law-abiding citizen's right to armed self-defense,'[*Bruen*, 597 U.S. at 29,] leads to the conclusion that these laws are relevantly similar to a law that prohibits drug traffickers from possessing firearms," 2023 WL 5916467, at *8. *United States v. Dorsey*, Crim. No. 4:22-CR-00092, 2023 WL 7019185 (M.D. Pa. Oct. 25, 2023), summarized the *Reichanbach* analysis, noting they were both cases where the defendant had previously been convicted of 35 P.S. § 780-113(a)(30), *id.* at *1, Williams underlying felony offense in this case, *see supra* p. 19.

Applying the "how and why" test to individuals who have been convicted of drug trafficking offenses, *Dorsey* repeated *Reichenbach's* observation that "'[i]llegal drug trafficking is a largely modern crime with no direct historical analogue,' and therefore the Court considered 'varied analogues in analyzing whether § 922(g)(1) may properly bar drug traffickers from possessing firearms.'" 2023 WL 7019185, at *1 (quoting *Reichenbach*, 2023 WL 5916467, at *6 (internal quotation omitted)). *Reichenbach* determined that early American laws, "although somewhat disparate in their targets and impact, all share a common concern and throughline. They were all targeted at groups that lawmakers deemed

_____

threat justifying the prohibition on the possession of arms must be of the same content, then it may reasonably be said that there is no analogy that can be found given the chasm between those perceived social threats permitting the prohibition of arms in 18th and 19th century America and those of the 20th and 21st centuries.

dangerous and disruptive to society, and were aimed at protecting the public from violence

and disorder." 2023 WL 5916467, at *7.

Dorsey provided the following summary of Reichenbach's "how and why" analysis:

Applying th[e] historical analogues to § 922(g)(1), as applied to individuals who have been convicted of felony drug trafficking offenses, this Court then examined "the question of 'how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" [Reichenbach, 2023 WL 5916467, at *8 (quoting Bruen, 142 S. Ct. 2132-33).] In assessing the "why" metric, the Court noted that early American laws "were targeted at groups that lawmakers deemed dangerous and disruptive, and the laws sought to protect the public from violence and disorder" and observed that, as applied to drug trafficking offenses, "lawmakers have made a reasoned decision that drug traffickers are dangerous and disruptive to society. Especially so given the well understood connection between drugs, firearms, and deadly violence, which the Supreme Court has described as a 'dangerous combination.'" [Id. (quotiing Muscarello v. United States, 524 U.S. 125, 132 (1998)).] The why of early laws and modern laws therefore closely align. [Id.]

So too does the "how" metric: "modern society has, similar to the founding generation, decided that the only effective method of protecting the lives of its citizens is by preventing convicted drug traffickers from possessing firearms." [Id. at *8-9.] Given that both metrics closely align the Nation's early firearm regulations with § 922(g)(1) as applied to convicted drug traffickers, "the Court easily conclude[d] that those early American laws are sufficiently analogous to § 922(g)(1) as applied to drug traffickers," and any indictment based upon § 922(g)(1) "must stand." [Id. at *9.]

2023 WL 7019185, at *2.

Because Williams has been convicted of a felony drug trafficking offense, the same

as that committed by Reichenbach and Dorsey, the Court concludes that the reasoning

applied in these cases also applies here. Therefore, Defendant's as-applied challenge to §

922(g)(1) fails.[10]

The Court having previously concluded that §922(g)(1) is facially constitutional,

Defendant's Second Amendment challenge to Count Five fails and his as to this count will

be denied.

## B. Counts One, Two, and Three

Defendant asserts that he is entitled to a judgment of acquittal or a new trial on

Counts One and Two which charge him with knowing and intentional distribution and

possession with intent to distribute cocaine within 1,000 feet of the real property of a public

secondary school in violation of 21 U.S.C. §§ 841(a)(1) and 860, and on Count Three which

charges him with knowing and intentional possession with intent to distribute 500 grams and

more of a mixture and substance containing a detectable amount of cocaine in violation of

21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). *See supra* p. 1.

In support of his assertion that a judgment of acquittal is appropriate on these

counts, Defendant contends that

> no rational trier of fact could have found the essential elements to the crimes
> charged beyond a reasonable doubt. More specifically, no rational trier of fact

---

[10] With this determination, the Court rejects Defendant's argument regarding the need for a comparison of the dangerousness of individuals historically disarmed and Defendant. (*See* Doc. 208 at 4-5.) As set out previously in the margin, *see supra* n.8, the Third Circuit in *Range* expressly declined to determine whether "dangerousness" is the touchstone in determining whether there is a sufficiently analogous statute or regulation permitting the disarmament of certain groups of people. *Range*, 69 F.4th at 104 n. 9. Further, the Court finds that the Government cited ample support for the proposition that drug traffickers' conduct has been deemed analogously dangerous to the conduct of those historically disarmed. (*See* Doc. 205 at 30-32.)

could have found that Mr. Williams possessed with the intent to distribute or distributed cocaine within 1,000 feet of a school on March 29, 2018 or on April 18, 2018. The evidence was insufficient for the jury to conclude that the alleged substance was in-fact cocaine; and the evidence was insufficient for the jury to conclude that the alleged transactions took place within 1,000 feet of a school.

(Doc. 200 at 13.) This is the total argument offered to satisfy Defendant's burden of showing

that "the prosecution's failure is clear." *See supra* p. 4 (quoting *United States v. Smith*, 294

F.3d 473, 476 (3d Cir. 2002)). The conclusory assertions quoted are clearly insufficient for

Defendant to meet his burden of showing that no rational trier of fact would have found him

guilty of Counts One, Two, and Three. Further, when the assertions are viewed in the

context of the record, they are totally without merit.

*1. Alleged Substance*

Although Defendant conclusorily states that there was insufficient evidence for the

jury to conclude that the substance at issue in Counts One, Two, and Three was cocaine

(Doc. 200 at 13), ample evidence was produced at trial for a rational trier of fact to find that

the substance at issue was in fact cocaine. (*See* Doc. 205 at 37-38 (citing Notes of

Testimony regarding testing of substances purchased from Defendant on March 29, 2018,

(Count One), and April 18, 2018, (Count Two), and the substance recovered from

Defendant's residence on May 3, 2018, (Count Three)).) In his reply brief (Doc. 208),

Defendant did not address the evidence cited by the Government nor in any way seek to

undermine trial testimony regarding the gathering and testing of the substances obtained on

March 29, 2018, April 18, 2018, and May 3, 2018. Thus, Defendant does not point to any

deficiency in trial testimony and evidence relevant to the establishment of cocaine as the substance purchased and confiscated.

For example, Defendant does not undermine the testimony of Task Force Officer Christopher Shelley who was involved with the investigation which led to the charges at issue and testified that he had experience with securing evidence, packaging, and maintaining suspected drug substance samples and how that was done in this case, and also testified, with specific reference to relevant exhibits, that the laboratory testing of samples from the March 29, 2018, and April 18, 2018, purchases were positive for cocaine. (N.T. Apr. 18, 2023, 43:15-192:7.) Defendant does not undermine the testimony of Larry Whitehead, coordinator for the Luzerne County Drug Task Force who executed the search warrant at Defendant's residence on May 3, 2018, and testified specifically that the field and laboratory tests of the substance found at the residence were positive for cocaine. (N.T. Apr. 19, 2023, 63:21-76:9). Defendant does not undermine the testimony of Dr. Joseph Cusick, a DEA Senior Forensic Chemist admitted as an expert in the field of controlled substance identification, who testified that the substance he tested in this case (that obtained from the May 3, 2018, residence search) contained cocaine. (*See, e.g.,* N.T. Apr. 19, 2023, 106:6-12,110:18-24, 114:15-115:9.)

For the reasons stated, Defendant has not met his burden of showing that no rational trier of fact could have found that the substances at issue were cocaine.

*2. School Proximity*

Defendant conclusorily states that there was insufficient evidence for the jury to conclude that the alleged transactions took place within 1,000 feet of a school. (Doc. 200 at 13.) However, in his background summary of Counts One and Two, he provided additional information on this issue:

> The Government relied on testimony and evidence produced from the Monroe County Geographic Information System ("GIS") and other rudimentary means to establish that these alleged controlled purchases of cocaine took place within 1,000 feet of a school. (Doc. 183 at 115-28). The Government did not produce a deed, lease, or survey of the property.

(Doc. 200 at 3-4.)  If liberally construed as an argument that a rational trier of fact could not conclude that the transactions at issue took place within 1,000 feet of a school without a deed, lease, or survey of the property alleged to be a school, Defendant provides no legal authority to support the proposition that such evidence was necessary for a rational trier of fact to conclude that the proximity requirement was met.

The statute at issue provides in relevant part as follows:

> Any person who violates section 841(a)(1) of this title or section 856 of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university or a playground…is (except as provided in subsection (b)) subject to (1) twice the maximum punishment by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense.

21 U.S.C. § 860(a).

As argued by the Government, the statute does not require school *ownership* of the property comprising the school. (*See* Doc. 205 at 40.) The Government catalogued evidence concerning the measurement of the distance from the March 29th and April 18th drug transactions. (*Id.* at 40-42.) Defendant did not address this issue in his reply brief. Therefore, Defendant neither provided authority regarding the need for a deed, lease, or survey nor undermined the ample evidence presented at trial showing that the distance from the purchases to the school was well below 1,000 feet.

Because Defendant has not shown that there was insufficient evidence for a rational trier of fact to find him guilty of Counts One, Two, and Three, he is not entitled to a judgment of acquittal on these counts.

**C. Count Four**

Defendant asserts that he is entitled to a judgment of acquittal or a new trial on Count Four which charges him with knowing and intentional possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). (Doc. 200 at 13.) Defendant specifically argues that

> no rational trier of fact could have concluded that Mr. Williams possessed a firearm in furtherance of drug trafficking. The firearms that were located in the second-floor nightstands of Mr. Williams' residence for self-defense purposes were not located in proximity to the alleged cocaine or $17,000 that were located on the first floor of the residence within a few feet of the entry way door to the house. The firearms could not have been used to protect the alleged drugs or drug proceeds since someone could have easily come into the first floor door and taken the alleged cocaine and $17,000 without going upstairs to the second floor of the residence where the firearms were located.

(*Id.* at 13-14.) In making his motion for judgment of acquittal at trial, Defendant's counsel

stated that, "during countless surveillance, . . . no law enforcement agent ever witnessed

Mr. Williams use or possess a firearm [and the CI] testified she never saw Williams with a

firearm. (N.T. Apr. 19, 2023, 120:3-6.)

The Court's instruction regarding Count Four included the following:

Mere presence of a firearm at the scene is not enough to find possession in furtherance of a drug trafficking crime. The firearm's presence may be coincidental or entirely unrelated to the underlying crime. Some factors that may help you determine whether possession of a firearm furthers a drug trafficking crime include but are not limited to:

     1. The type of criminal activity that is being conducted.

     2. Accessibility of the firearm.

     3. The type of firearm.

     4. Whether the firearm is stolen.

     5. Whether the Defendant possesses the firearm legally or illegally.

     6. Whether the firearm is loaded.

     7. The time and circumstances under which the firearm is found.

     8. Proximity to drugs or drug profits.

(N.T. Apr. 20, 2023, 71:5-20.)

The Jury was also instructed that the requirement in Counts Four and Six that

Defendant knowingly possessed a firearm meant that he had to have the firearm within his

control, that the "Government does not have to prove that James Williams, physically, held the firearm, that is, had actual possession of it." (N.T. Apr. 20, 2023, 72:20-23.)

The jury instruction regarding possession shows that Defendant's argument concerning actual possession is without merit. Defendant's scenario alleging that the weapons were not in proximity to the drugs and drug profits is based on his subjective interpretation of "proximity."  Where he thinks guns in his second-floor bedroom are not in proximity to drugs in the kitchen and $17,000 in a safe in the first-floor dining room closet, a rational trier of fact could find that the firearms being in the same house and readily accessible (the firearms were in unlocked nightstand drawers (N.T. Apr. 19, 2023, 80:15-16, 81:12-13, 86:18-19)) satisfied the "proximity" factor. Moreover, Defendant's argument ignores that evidence presented at trial showed that $4,000 was found in Defendant's bedroom, the same room in which three firearms were found, two of which were loaded. (N.T. Apr. 19, 2023, 80:3-81:9.)

Regarding other factors to be considered by the jury, as the previous analysis of Defendant's challenge to Count Five showed, weapons and drug trafficking are commonly linked. The jury found Defendant guilty of Count Six for knowing possession of a stolen firearm which means that all jurors found that one of the accessible firearms was stolen and that Defendant illegally possessed it. Two of three accessible firearms were loaded. (N.T. 81:7-9, 86:14-17.)

37

Thus, evidence presented at trial showed that at least six of the eight factors considered by the jury could be indicative of possession of a firearm that furthered drug trafficking, i.e., the type of criminal activity, accessibility of the firearm, stolen firearm, illegal possession of a firearm, loaded firearms, firearms' proximity to drugs and drug profits. This summary also shows that Defendant's argument that there was insufficient evidence for a rational trier of fact to find him guilty of Count Four is without merit and he is not entitled to a judgment of acquittal on this count.

## D. Count Six

Although Defendant asserts that he is entitled to a judgment of acquittal on all counts (Doc. 200 at 11), he presents no argument as to Count Six. Therefore, further discussion of Count Six is not warranted.

## E. Motion for a New Trial

In his supporting brief, Defendant merely asserts that he is entitled to a new trial on all counts because the evidence does not support the verdict.  (Doc. 200 at 11.) Clearly, this does not satisfy his burden of showing that he is entitled to a new trial. In his reply brief, Defendant makes a more specific argument, asserting that he is entitled to a new trial because the jury heard inadmissible and prejudicial testimony under the assumption that § 922(g)(1) was constitutional as applied to him and *Range* later showed that § 922(g)(1) is unconstitutional as applied to him. (Doc. 208 at 5-6.) Given the Court's conclusion that Defendant's as-applied challenge to § 922(g)(1) fails, his argument that a new trial is

warranted because the jury heard inadmissible and prejudicial testimony assuming

otherwise also fails.

## V. CONCLUSION

For the foregoing reasons, Defendant's Post-trial Motion for Judgment of Acquittal

and New Trial (Doc. 199) will be denied. A separate Order will enter.

Robert D. Mariani
United States District Judge